# Supreme Court of Texas

No. 23-0697

State of Texas et al.,
*Appellants*,

v.

Lazaro Loe et al.,
*Appellees*

On Direct Appeal from the
201st District Court, Travis County, Texas

JUSTICE BLACKLOCK, joined by Justice Devine, concurring.

"I will do no harm or injustice." The Hippocratic Oath, ca. 400 B.C.[1]

This case arises from irreconcilably conflicting visions of what it means for doctors to do "harm or injustice" to children experiencing confusion and distress about the normal biological development of their bodies. The first vision—call it the Traditional Vision—holds that a boy is a boy, a girl is a girl, and neither feelings and desires nor drugs and

---

[1] Michael North, *Translation of the Hippocratic Oath*, NATIONAL LIBRARY OF MEDICINE (2002), https://www.nlm.nih.gov/hmd/topics/greek-medicine/index.html (last visited June 26, 2024).

surgery can change this immutable genetic truth, which binds us all. Within the Traditional Vision, human males and females do not "identify" as men and women. We *are* men and women, irreducibly and inescapably, no matter how we feel. Proceeding from these moral and philosophical premises, the Traditional Vision naturally holds that medicinal or surgical interference with a child's developing capacity for normal, healthy sexual reproduction is manifestly harmful to the child, an obvious injustice unworthy of the high label "medicine." The Traditional Vision further holds that adolescent children who feel out of place in their physically healthy, normally developing bodies should receive mental health care that seeks to accommodate their feelings to the biological reality of their bodies, which are unavoidable and irreplaceable components of who they truly are.

The second vision—call it the Transgender Vision—holds that we all have a "sex assigned at birth," which usually corresponds to our physical traits but which may or may not correspond to our inwardly felt or outwardly expressed "gender identity." It holds that a person's gender identity is a constitutive part of his or her humanity and that when a person's biological sex and gender identity diverge, often gender identity should be given priority. Based on these moral and philosophical premises, the Transgender Vision holds that an adolescent child who feels out of place in a biologically normal body should in many cases take puberty-blocking drugs designed to retard or prevent the emergence of sexual characteristics out of line with the child's gender identity. Ultimately, the Transgender Vision holds that a person's body can be, and in many cases should be, conformed to the person's gender

identity—using hormone therapy and even the surgical removal of healthy sexual organs—in pursuit of the person's mental health.

These competing visions of the human person diverge at the most basic level. The divergence is unbridgeable. We can talk about it in terms of empirical debates over the efficacy or side-effects of the disputed treatments, but the core of the matter is a deep conflict over human nature. In the end, the disagreement is one of philosophy, morality, even religion. The medical debates at issue in this litigation are merely the surface-level consequences of deep disagreement over the deepest of questions about who we are. In some ways, the answers to the medical questions are derivative of the answers to the deeper questions. Thus, under the Traditional Vision, the disputed treatments are self-evidently harmful to children, cannot rightly be called medical care, and should quite obviously be discouraged, by force of law if necessary. From within the Transgender Vision, however, these treatments are necessary medical care, the failure to provide them is a cruelty, and outlawing them is a grave injustice.[2]

The heart of the dispute is moral and political, not scientific and medical. Doctors have no special expertise in answering moral and political questions. As the plaintiffs' expert testimony demonstrates,

---

[2] Of course, science may demonstrate empirically that the childhood gender-transition treatments that exist today—which have a very limited track record—have harmful side-effects and do not deliver the mental-health benefits their proponents promise. This seems already to be happening. *See infra* note 5. But for those who hold the Transgender Vision, this scientific development would not resolve the deep questions driving the debate. It would instead drive an urgent search for new childhood gender-transition treatments.

doctors often adopt moral and political judgments of their own before they begin to answer the downstream scientific and medical questions. Doctors are surely useful sources of information to aid those tasked with answering moral and political questions about the human body, but doctors are not oracles in possession of special moral insight. Nor are judges the ideal place to look for answers to political questions.

Our Constitution tells us where to look. In the State of Texas, "[a]ll political power is inherent in the people." TEX. CONST. art. I, § 2. This litigation asks whether the sovereign People of Texas have the power, through their representatives in the Legislature, to answer moral and political questions about childhood transgender therapy in accordance with the Traditional Vision of what it means to be human, male and female. The answer is yes.[3]

---

[3] Some may balk at the suggestion that the Legislature answers moral questions. But most laws of any consequence arise from a moral vision and reflect the moral judgment of the lawmaker. Law cannot be separated from moral judgment. "Law is related to morality inasmuch as justice is a moral concept which is meaningless outside the area of morality." Arthur Scheller Jr., *Law and Morality*, 36 MARQ. L. REV. 319, 323 (1953). The question is not *whether* the law will reflect a moral vision of justice. The question is *whose* moral vision of justice the law will reflect.

Another question that should concern all of us is whether the moral vision reflected in the law is a true vision or a false vision. In Thomas Carlyle's characteristically colorful words:

> Needless to vote a false image true; vote it, revote it by overwhelming majorities, by jubilant unanimities and universalities; read it thrice or three hundred times, pass acts of parliament upon it till the Statute-book can hold no more,—it helps not a whit: the thing is not so, the thing is otherwise than so; and Adam's whole Posterity, voting daily on it till the world finish, will not alter it a jot. Can the sublimest sanhedrin, constitutional parliament, or other Collective Wisdom of the

* * *

Until very recently in human history, the Traditional Vision was the only vision. The questions this case raises did not exist.[4] They were hardly conceivable. Had they been asked, essentially everyone ever to live would have answered based on the Traditional Vision of human nature. Yet remarkably, despite its recent provenance, the Transgender Vision quickly captured the heights of the medical establishment,[5] as

> world, persuade fire not to burn, sulphuric acid to be sweet milk, or the Moon to become green cheese? The fact is much the reverse.

THOMAS CARLYLE, *Stump-Orator*, *in* LATTER-DAY PAMPHLETS 146, 173 (London, Chapman & Hall 1850).

[4] "The term 'transgender' is said to have been coined 'in the early 1970s,' and the term 'gender identity,' . . . apparently first appeared in an academic article in 1964." *Bostock v. Clayton County*, 590 U.S. 644, 715 (2020) (Alito, J., dissenting). "Transsexualism" was introduced in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders in 1980 and was replaced in 1994 by "gender identity disorder." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 784–85 (4th ed. 1994). At the time, it was categorized under "sexual and gender identity disorders." *Id.* Only in 2013 did "gender dysphoria" replace "gender identity disorder" in the official diagnostic manual. *Gender Dysphoria Diagnosis*, AM. PSYCHIATRIC ASS'N, https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis (last visited June 26, 2024).

[5] By "medical establishment," I mean the bureaucratic organizations that present themselves to the world as the voices of official medical opinion. These organizations almost universally adopt the Transgender Vision in their public statements. *See, e.g.*, *APA adopts groundbreaking policy supporting transgender, gender diverse, nonbinary individuals*, AM. PSYCHOLOGICAL ASS'N (Feb. 28, 2024), https://www.apa.org/news/press/releases/2024/02/policy-supporting-transgender-nonbinary; *Attacks on Gender-Affirming and Transgender Health Care*, AM. COLL. OF PHYSICIANS (Apr. 24, 2023), https://www.acponline.org/advocacy/state-health-policy/attacks-on-gender-affirming-and-transgender-health-care; *WMA Statement On Transgender*

5

well as many other places of power in our society—including universities, large corporations, and the media.[6]

Consider the American Psychiatric Association's definition of "gender dysphoria" as "the psychological distress that results from an incongruence between one's sex assigned at birth and one's gender

---

*People*, WORLD MED. ASS'N (Mar. 26, 2024), https://www.wma.net/policies-post/wma-statement-on-transgender-people/. How real-world doctors view the subject is a far more complicated matter. *See, e.g.*, Brief for Do No Harm as Amicus Curiae Supporting Appellants, at 1 ("Do No Harm is a diverse group of physicians, healthcare professionals, medical students, patients, and policymakers whose goal is to protect healthcare from a radical, divisive, and discriminatory ideology."); Devon Kent et al., *Assessing Comfort of Physicians to Provide Transgender-Specific Care*, 7 TRANSGENDER HEALTH 533, 537 (2022) ("[M]ost [Nevadan physicians] feel uncomfortable providing hormonal treatment.").

Any claim to "consensus" in the medical community—never a claim that reflected reality—seems to be crumbling quickly, even on its own terms. As the Court notes, many of the European countries that initially pioneered transgender treatments for minors are rapidly pulling back. *Ante* at 3 n.2; *see also* Azeen Ghorayshi, *Youth Gender Medications Limited in England, Part of Big Shift in Europe*, N.Y. TIMES (Apr. 9, 2024), https://www.nytimes.com /2024/04/09/health/europe-transgender-youth-hormone-treatments.html. The Cass Review, a multi-year study commissioned by England's National Health Service—hardly a proponent of the Traditional Vision—recently cast serious doubt on the advisability of puberty blockers and hormone therapies for minors, even for those who hold the Transgender Vision. Perhaps most notably, the Review concluded that "the evidence does not adequately support the claim that gender-affirming treatment reduces suicide risk." INDEPENDENT REVIEW OF GENDER IDENTITY SERVICES FOR CHILDREN AND YOUNG PEOPLE: FINAL REPORT 187 (chaired by Hilary Cass, 2024).

[6] As on many other questions, the American people have not fallen obediently in line with elite opinion. One recent survey found that only 19% of Americans support "[a]llowing transgender youth access to puberty blockers," while 54% oppose it. Taylor Orth, *Where Americans stand on 20 transgender policy issues*, YOUGOV (Feb. 16, 2024, 9:47 AM), https://today.yougov. com/politics/articles/48685-where-americans-stand-on-20-transgender-policy-issues.

identity."[7]  We have become accustomed in recent years to seeing such morally loaded verbiage presented as uncontroversial fact in what were once trusted sources of authority, like medical journals and newspapers. But from outside the Transgender Vision, neologisms like "sex assigned at birth" and "gender identity"—while intelligible as theoretical concepts—simply do not correspond to reality.[8]  Our ability to conceive of them, and even to believe in them, does not make these concepts real. From within the Traditional Vision, these concepts appear as myths believed by those who hold the Transgender Vision.  The fervent belief (or social status) of the myth's adherents does not make the myth true. Nor does the fervent belief or social status of the myth's adherents require those who do not subscribe to the myth to exercise their political power in accordance with the myth's premises.

Outside the Transgender Vision, our identity as men and women is a brute fact of our existence.  Outside the Transgender Vision, our "gender identity," to the extent such a thing exists, arises ineluctably from genetics and biology—not from feelings, choices, or psychiatric diagnoses.  Outside the Transgender Vision, we are genetically male or female from the moment of conception, and our parents and doctors have no choice in the matter—so there is no such thing as "sex assigned at birth."  Outside the Transgender Vision, the notion that a physically

---

[7] *What is Gender Dysphoria*, AM. PSYCHIATRIC ASS'N, https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria (last visited June 26, 2024).

[8] As recently as the 1980s, Webster's had no entry for "gender identity," and the definition of "gender" was a single word: "sex."  *See Gender*, WEBSTER'S NEW COLLEGIATE DICTIONARY (8th ed. 1981).

healthy but psychologically troubled boy might *actually* be a girl in some *real* sense is nothing but a fantasy—except that this fantasy can be dangerous in real life because some doctors may act on it in ways that can permanently alter the boy's healthy bodily functioning. Outside the Transgender Vision, just as men and women are "endowed by their Creator with certain unalienable Rights," we are also endowed by our Creator with certain unalienable genetic traits, "male and female."[9] Outside the Transgender Vision, a law prohibiting doctors from altering a child's healthy body in service of a misguided fantasy is perfectly reasonable, perhaps even so obviously right and just as to be unremarkable.

The plaintiffs accuse the Legislature of acting out of "anti-transgender animus"—which I take to mean irrational hostility or hatred of people who claim a transgender identity. Likely there are some holders of the Traditional Vision who bear ill-will against such people. This is regrettable. But just as likely there are holders of the Transgender Vision who bear ill-will against those who hold the Traditional Vision. This is equally regrettable. Sincere disagreement on a disputed philosophical question about human nature does not entail hostility or hatred toward those who disagree. By and large, those who hold the Traditional Vision proceed from a sincere conviction that the Transgender Vision is, in the end, make-believe. They do not proceed from hatred or hostility toward anybody, and they need not abandon or conceal their sincere convictions to avoid nasty labels like

---

[9] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776); *Genesis* 1:27.

"animus." From their perspective, the Transgender Vision is much like other forms of make-believe. Perhaps it can be indulged to a degree, but a line must be drawn when it threatens physical harm to a child.

* * *

The legal question before the Court is whether the Texas Constitution—whose relevant language was last ratified in 1876—enshrines a right to administer transgender treatments to children. "Our goal when interpreting the Texas Constitution is to give effect to the plain meaning of the text as it was understood by those who ratified it." *In re Abbott*, 628 S.W.3d 288, 293 (Tex. 2021). From a constitutional perspective—a perspective focused on the original meaning of a nineteenth-century legal document—we should begin by noting that the Transgender Vision would have been utterly inconceivable to those who wrote and ratified our Constitution. Would Texans in 1876 have understood the Constitution they ratified to enshrine the right asserted by the plaintiffs? To ask this question is to answer it.[10]

As the plaintiffs rightly point out, however, Texans in 1876 would have taken a very strong view of the traditional right of parents to direct the upbringing of their children, including with respect to medical care. For this reason, we have long recognized the "fundamental nature of the parental right to make child-rearing decisions," *In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021), and we have adopted a strong presumption that a

---

[10] On the other hand, would Texans in 1876 have understood either their Constitution or their pre-existing legal traditions to protect them from a government that tried to coerce parents, against their will, to allow transgender therapy for their children? I suspect that to ask this question is also to answer it.

9

parent "acts in the best interest of his or her child." *In re C.J.C.*, 603 S.W.3d 804, 808 (Tex. 2020). But the plaintiffs point to no time in Texas history—and to no aspect of Texas's legal traditions—in which the Legislature was thought to be powerless to outlaw a practice it considers to be severe child endangerment masquerading as medical care.

The plaintiffs and their doctors hold a robust version of the Transgender Vision.[11] They take it for granted that judges will assume the legitimacy of that vision when analyzing their claims—as have the lower court and the dissenting Justice. But in order for their claims to succeed, the plaintiffs must show that the Texas Constitution requires the *Legislature* to assume the legitimacy of the Transgender Vision when it approaches these questions. If it does not—if the Constitution permits the Legislature to proceed from the Traditional Vision—then this case is very simple. Viewed from inside the Traditional Vision, what the Legislature has done is unquestionably within its constitutional power to regulate medicine. *See* TEX. CONST. art. XVI, § 31. Viewed from inside the Traditional Vision, the Legislature has prohibited doctors from disrupting and destroying children's healthy bodies on the basis of a dangerous and thoroughly misguided ideological fad with no roots in our society's history or traditions. From within the Traditional Vision, this law passes the constitutional test by any measure—no

---

[11] *See, e.g.*, Brief for Appellees, at 6 ("Gender identity refers to a person's core sense of belonging to a particular gender."; "A person's gender identity does not always match the sex the person was assigned at birth."; "People whose gender identity aligns with their sex assigned at birth are cisgender . . . ."; "Being transgender is not a condition to be cured. It is a core, defining trait of identity that a person should not be forced to change or abandon . . . .").

10

matter which "tier of scrutiny" the courts apply. Only from outside the Traditional Vision—from deeply within the Transgender Vision—do the plaintiffs' contentions about the law's irrationality or the State's lack of a compelling interest have any force at all.

All involved agree that our society must draw a line somewhere between parental autonomy and child endangerment. The question before the Legislature was this: Does using the disputed treatments on children in service of the Transgender Vision fall on the parental autonomy side of the line or the child endangerment side of the line? The Texas Legislature in 2023 answered this question the same way the Texas Legislature in the 1870s (or the 1970s) would have answered it, had it arisen. Yet the plaintiffs' argument is that the 1876 Texas Constitution implicitly prohibits the Texas Legislature from answering as it did—despite the historical reality that the asserted right would have been both inconceivable and, frankly, horrifying to nearly everyone at the time of ratification. Only by commandeering the Constitution in service of the Transgender Vision, a moral vision that has never once— from 1836 to 2024—obtained the consent of the People of Texas, could any court give the plaintiffs what they seek.[12] This Court is not in the business of "interpreting" the Constitution that way.

---

[12] Notwithstanding *Bostock v. Clayton County*, no serious argument can be made that the American people—or any of their elected representatives— made a deliberate decision in 1964 to grant Title VII employment-discrimination protections to men and women who "identify" as the opposite sex. *Bostock*'s textual analysis proceeds from moral and philosophical premises that were hardly imaginable in 1964. Like doctors who assume the Transgender Vision before telling us what is best for their pediatric patients, *Bostock* assumes the Transgender Vision before telling us what

11

Title VII means. Consider this key passage from the majority opinion: "Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock*, 590 U.S. at 660.

As *Bostock* sees it, a biological female who "identifies" as a woman shares a "trait or action" in common with a biological male who "identifies" as a woman. This is the crux of the argument—that both of these people "identify" as women. To hire the biological female but fire the biological male because both identify as a woman is to discriminate against the biological male for being a biological male—in violation of Title VII, *Bostock* says. The unspoken philosophical assumption indispensable to this logic is that when a biological male "identifies" as a woman, something similar is happening as compared to when a biological female "identifies" as a woman. *Bostock* cannot get to its result, even on its own terms, without asserting that biological males who identify as women are similarly situated with biological females who identify as women. *Id.* at 657–58. To support that claim, *Bostock* must assume that the way in which a biological woman perceives herself to be a woman is comparable to the way in which a biological man perceives himself to be a woman—i.e., that we are talking about essentially the same thing when we say of these two people that each "identifies" as a woman. This equivalence is perhaps *the* core assumption of the Transgender Vision. And if the equivalence is valid, as *Bostock* assumes it is, then there is force to *Bostock*'s argument that the employer is discriminating against the transgender person on the basis of his biological sex.

But if the equivalence is not valid—that is, if a human female's innate identity as a woman is an immutable genetic given, rather than a feeling or a choice, and is therefore *different in kind* from a human male's declaration of a transgender identity, then *Bostock*'s logic falls apart. If a biological woman *correctly* identifying herself as a woman is a *far different thing* from a biological man *incorrectly* identifying himself as a woman, then the two people do not share a "gender identity," they are not at all similarly situated, and their employer is not treating the female better than the male on the basis of a trait or action they share in common. From within the Traditional Vision, the male who claims to identify as a woman does not thereby have anything in common with real women, who do not *identify* as women but simply *are* women. From within the Traditional Vision, a male who *believes* he is a woman and a female who *knows* she is a woman could hardly be less similarly situated with respect

12

Like the legislative branch, the judicial branch is not obligated to adopt the Transgender Vision when it approaches these questions. In fact, if our constitutional heritage reflects one moral vision or the other, it is most certainly the Traditional Vision, the vision held by all those from whom we inherited the Texas Constitution.

\* \* \*

Like the Court, I do not understand our decision today to authorize the government to interfere with parental authority in areas the law traditionally leaves to parents. *Ante* at 25. Whether to use drugs or surgery to *disrupt* or *destroy* the normal biological functioning of a child is not one of those areas. On the other hand, whether to use drugs or surgery to *preserve* or *restore* the normal biological functioning

---

to the matter. She is right, and he is wrong. Her perception of reality is true, and his is false. The two have nothing in common—at least not in the realm of sex and gender. *Bostock*'s logic cannot stand if a person's declaration of a transgender identity is understood as a misguided break from reality, as it was by nearly everyone in 1964—rather than as a revelation of reality, as it is by some people today. From within the Traditional Vision, an employer who hires a woman who correctly perceives her true sex but declines to hire a man who incorrectly perceives his true sex is in no sense discriminating against the man on the basis of sex. He is discriminating on the basis of whether the applicant correctly perceives reality, which is not a characteristic with which Title VII is concerned.

In the end, if we read Title VII from the perspective of the Transgender Vision, the Court's position in *Bostock* is quite plausible. But if we read Title VII from the perspective of the Traditional Vision—the perspective from which it was written in 1964—then the Court's position quickly falls apart. Without saying so, the Court in *Bostock* chose a side in an ongoing moral and political debate. One obvious problem with the Court's choice is that virtually nobody in 1964 was on the Court's side. The result is that, like the Fourteenth Amendment, Title VII is now a living document that will follow fashionable 21st century opinion in enormously consequential ways that those who originally consented to its enactment could not have imagined.

13

of a child *is* an area in which our legal traditions have long recognized a wide degree of parental autonomy.

This distinction—between treatments that seek to disrupt or destroy a person's normal biological functions, and treatments that seek to preserve or restore a person's normal biological functions—goes to the heart of an important question lurking in the background of this case: What is medicine?  Is it just anything a doctor does for a patient?  Or does genuine medicine have a *telos*—a goal, a purpose?  By calling the disputed treatments "medical care" without asking what "medical care" is and is not, we may be adopting a premise of the Transgender Vision without meaning to do so.

The Legislature's constitutional power to regulate "practitioners of medicine," *see* TEX. CONST. art. XVI, § 31, must include a power to distinguish between treatments that are genuinely "medicine" and those that are not.  In this realm, the Legislature may reasonably take the traditional view that medicine, rightly understood, is ordered toward the preservation or restoration of the normal, healthy bodily functioning of the human being.[13]  If that is what medicine *is*, then the disputed

---

[13] The Legislature's authority in this regard should be informed by the original meaning of the word "medicine," as used in the 1876 Texas Constitution.  The conception of "medicine" reflected in the challenged legislation and described in this opinion is consistent with what I take to be the founding-era understanding of that term. *See, e.g.*, *Medicine*, WEBSTER'S DICTIONARY 1828, https://webstersdictionary1828.com/Dictionary/medicine ("The art of preventing, curing or alleviating the diseases of the human body."); *Disease*, WEBSTER'S DICTIONARY 1828, https://webstersdictionary1828.com/Dictionary/disease ("any state of a living body in which the natural functions of the organs are interrupted or disturbed"); *Medicine*, 15 ENCYCLOPAEDIA BRITANNICA 794 (9th ed. 1883) ("Taking disease to be a deflexion from the line

14

treatments are not medicine at all. They may be services offered to patients by doctors, but because their purpose is to disrupt or destroy the patient's normal, healthy bodily functioning, they are different in kind from genuine medical care.

The text of the challenged legislation indicates that the Legislature had this distinction in view. The statute's ban on puberty-blocking drugs and other hormone therapy for children is not absolute. Instead, the ban targets the *purpose* for which the drugs are used. They may not be used "[f]or the purpose of transitioning a child's biological sex" or for the purpose of "affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." TEX. HEALTH & SAFETY CODE § 161.702. Using the drugs for these prohibited purposes disrupts or destroys normal, healthy, biological

---

of health, the first requisite of medicine is an extensive and intimate acquaintance with the norm of the body.").

While the founding-era understanding of "medicine" is the relevant one for understanding the Legislature's constitutional authority, such a traditional conception of medicine—as ordered toward the preservation and restoration of the patient's biological health rather than toward the satisfaction of the patient's desires—is not a defunct relic of times gone by. To the contrary, this view continues to play an important role in contemporary debates about medical practice and medical ethics. *See, e.g.*, FARR CURLIN & CHRISTOPHER TOLLEFSEN, THE WAY OF MEDICINE: ETHICS AND THE HEALING PROFESSION 107 (2021) (arguing that a physician's ethical obligation is to promote the objective biological health of the patient, which may entail "resist[ing] inducements to interfere with, interrupt, or otherwise revise the healthy development, maturation, and function of male and female sexual organs and capacities"); Leon R. Kass, *Regarding the end of medicine and the pursuit of health*, 40 THE PUB. INTEREST 11, 13–16, 29 (1975) (advocating for the ancient view that the end of medicine is the patient's objective health—as opposed to the gratification of the patient's desires or the pursuit of the patient's happiness; on this view, health is "the well-working of the organism as a whole" or "an activity of the living body in accordance with its specific excellences").

15

functioning, rather than promoting or restoring it. On the other hand, the law permits the drugs to be used "for the purpose of normalizing puberty for a minor experiencing precocious puberty." *Id.* § 161.703(a)(1). They may also be used on a child "born with a medically verifiable genetic disorder of sex development" or a child who "does not have the normal sex chromosome structure for male or female." *Id.* § 161.703(a)(2)(A), (B).

Thus, when the purpose of the drugs is to bring the bodies of children with biological abnormalities more into line with normal human sexual development, the drugs are legal. But when the purpose of the drugs is to disrupt or destroy normal human sexual development, the drugs are illegal. In the Legislature's judgment, one of these is legitimate medical care, and the other is not. This is a moral and political judgment. It is informed by science and medicine, but it is not controlled by scientists and doctors. The fact that expert witnesses or influential interest groups like the American Psychiatric Association disagree with the Legislature's judgment is entirely irrelevant to the constitutional question. The Texas Constitution authorizes the Legislature to regulate "practitioners of medicine." TEX. CONST. art. XVI, § 31. It does not authorize practitioners of medicine to regulate the Legislature—no matter how many expert witnesses they bring to bear. A legitimate distinction exists between treatments that seek to promote normal biological functioning in the patient and those that seek to destroy it. The Legislature was entitled to notice this distinction and to act upon it, as it has done.

We therefore need not hold that the Legislature could prevent a parent from seeking conventional medical care for a child in order to hold that the disputed treatments, which serve a purpose at odds with conventional medicine, are different in kind from genuine medical care and may therefore be removed from the realm of parental autonomy without threatening parents' traditional authority to make medical decisions for their children. I join the Court's opinion because nothing in it is inconsistent with this analysis.

\* \* \*

Another way to approach this case would be to ask whether the Texas Constitution grants parents the right to choose for themselves whether to raise their children in accordance with the Traditional Vision or the Transgender Vision. If the question were simply whether the Constitution protects the right of parents to teach their children to follow one viewpoint or another on questions of morality and human nature, the answer would be simple. Of course it does. *See, e.g.*, TEX. CONST. art. I, § 8 ("[N]o law shall ever be passed curtailing the liberty of speech . . . ."); *id.* art. I, § 6 ("No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion . . . .").

The matter at hand, however, is not the liberty to hold viewpoints or beliefs, but the liberty to act upon a child's body on the basis of those viewpoints or beliefs. The plaintiffs and their doctors do not invoke their freedom of religion. They claim that the Transgender Vision is an established matter of science, not a matter of belief. Of course, from the perspective of the Traditional Vision, any such assertion is an

17

incoherent conflation of speculative philosophy and empirical science. Neither a philosophical proposition ("gender identity is real") nor a moral rule ("gender identity should be affirmed") can be proven with the scientific method or the tools of medicine. Indeed, from within the Traditional Vision, the Transgender Vision has many characteristics not of a science, but of a religion.[14]

Had the plaintiffs asserted a *religious* right to the disputed treatments, their claim that the Texas Constitution protects their desired course of action would have been at its strongest. The freedom of religion often entails the freedom not just to *believe*, but to *act* upon one's beliefs—even, sometimes, in ways that could harm others. *See, e.g.*, TEX. CONST. art. I, § 6-a (protecting an absolute right to gather in person for worship, no matter what government epidemiologists think). But even if couched as a matter of religion, I do not think the right claimed in this case finds protection in our Constitution. Across history, many religious traditions have demanded that their adherents inflict permanent, physical harm on children. Our constitutional guarantee of religious freedom, robust as it is, has never been understood to protect treatment of children that would have been thought barbaric at the time of the founding.

In recent history, for example, immigrants from parts of Africa and the Middle East claimed a religious obligation to surgically remove

---

[14] To be fair, from within the Transgender Vision, the Traditional Vision surely also has characteristics of a religion. Perhaps, as has been said before, "all human conflict is ultimately theological." HILAIRE BELLOC, THE CRUISE OF THE "NONA" 54 (Century Publ'g 1983) (quote attributed to Henry Edward Cardinal Manning).

portions of a young girl's sexual organs.[15]  The practice, known as "female genital mutilation," was banned by federal law in 1996, and again in 2021.  18 U.S.C. § 116.  States, including Texas, have similar bans.  *E.g.*, TEX. HEALTH & SAFETY CODE § 167.001.  To my knowledge, none of these bans has been invalidated on religious liberty grounds.  Yet adherents to this practice genuinely believe they are doing the right thing for the children they love.  The same can surely be said of parents seeking transgender treatments for their child, who unquestionably act out of love and conviction.  Viewed from the Traditional Vision, however, the two practices are not altogether dissimilar.  Both disrupt the normal sexual development of a child's body in service of a vision of human nature that is altogether foreign to our society's moral traditions.

Thus far, the consensus has been that childhood female genital mutilation can be outlawed, despite the heartfelt religious objections of its politically powerless adherents.  If we judges were to say that childhood transgender treatments *cannot* be outlawed because of ideological objections from politically powerful places like the American Psychiatric Association, then what would really be doing the work?  It

---

[15] Tresa Baldas, *Religious defense planned in landmark Detroit genital mutilation case*, DETROIT FREE PRESS (May 21, 2017, 9:42 AM), https://www.freep.com/story/news/2017/05/21/female-genital-mutilation-religious-freedom/319911001/; *see also Female Genital Mutilation*, UNFPA SOMALIA, https://somalia.unfpa.org/en/topics/female-genital-mutilation-5 (last visited June 26, 2024) ("Despite United Nations resolutions calling for the elimination of FGM, the practice remains near universal in Somalia with a 99 per cent prevalence rate."); *Female genital mutilation*, UNFPA EGYPT, https://egypt.unfpa.org/en/node/22544 (last visited June 26, 2024) ("According to the Egyptian Family Health Survey (EFHS) 2021, 86 percent of Egyptian married women between the ages of 15 and 49 have undergone FGM, 74 percent of whom by doctors.").

would certainly not be the text or history of the Constitution. It would instead be yet another example of willful judges elevating fashionable elite opinion on a disputed moral question to the status of constitutional law, while imperiously consigning unfashionable opinion to the so-called dustbin of history. *See Obergefell v. Hodges*, 576 U.S. 644, 718 (2015) (Scalia, J., dissenting) (bemoaning judicially orchestrated "social transformation without representation").

\* \* \*

The plaintiffs rely primarily on the Due Course of Law Clause of the Texas Constitution.[16] In describing the federal constitution's somewhat analogous Due Process Clause, the U.S. Supreme Court has remarked that the Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citations and internal quotation marks omitted). Under *Glucksberg*, those who claim a substantive right under the Due Process Clause must first establish, among other things, that the right is "objectively, deeply rooted in this Nation's history and tradition." *Id.* I agree with the Court that, to the extent our Due Course of Law Clause provides any protection for substantive rights, it would only do so for "careful[ly] descri[bed]" rights that satisfy *Glucksberg*'s requirements. *Id.* at 721; *ante* at 21.

---

[16] "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19.

As the Court correctly concludes, the rights claimed in this case fail *Glucksberg*'s test because, among other reasons, the right to administer the disputed treatments to children is not "objectively, deeply rooted in this Nation's history and tradition." As the Court acknowledges, however, other assertions of parental authority might very well satisfy the *Glucksberg* standard.[17] Circumcision of baby boys, for instance, is a common practice with roots in our history and traditions. Thus, under *Glucksberg*'s approach, the Constitution might very well treat legislative efforts to ban circumcision quite differently from legislative attempts to ban novel practices that our society has not historically considered to be within the broad realm of parental authority.[18] For the same reason, the Constitution would likely treat the government's attempt to impose childhood transgender treatments on unwilling families much differently from the government's efforts to prohibit those treatments.

---

[17] As I have written before, I am not convinced that constitutional protection for parental rights—the existence of which both this Court and the U.S. Supreme Court have repeatedly and rightly acknowledged—finds its most suitable grounding in substantive due process (or substantive due course of law). *See In re H.S.*, 550 S.W.3d 151, 177–78 (Tex. 2018) (Blacklock, J., dissenting) (suggesting the Privileges and Immunities Clause and the Ninth Amendment as potential alternative bases for recognizing that traditional parental authority over children has a constitutional dimension beyond the Legislature's reach).

[18] Because of circumcision's connection to religious practice, many of its proponents would likely succeed in opposing the government's prohibition of it by asserting their religious liberty—without resorting to the shakier ground of substantive due process. Even so, because of its roots in history and tradition, the parental right to circumcise a male child would likely fare much better under *Glucksberg* than would transgender treatments or female genital mutilation.

A parental right to use drugs or surgery to disrupt or destroy a child's normal biological functions is not "objectively, deeply rooted in this Nation's history and tradition." By contrast, whether and how to use drugs or surgery to preserve or restore a child's normal biological functions is a question long committed to a significant degree of parental autonomy in our society. By denying constitutional protection to the former, the Court does not hold that the Constitution has nothing to say about the latter.

* * *

The Texas Legislature has the power, under our Constitution, to uphold the Traditional Vision of human nature, to express our society's collective moral judgment about the disputed treatments, and to protect children as it has done. I therefore respectfully concur and join the Court's opinion.

James D. Blacklock
Justice

**OPINION FILED:** June 28, 2024

22